IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

PAUL WILLIAM WALDEN,

                    Petitioner,

      vs.

PATRICK COVELLO, Warden, Mule
Creek State Prison,[1]

              Respondent.

No. 2:19-cv-01614-JKS

MEMORANDUM DECISION

Paul William Walden, a state prisoner proceeding *pro se*, filed a Petition for a Writ of
Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Walden is in the custody of the
California Department of Corrections and Rehabilitation and incarcerated at Mule Creek State
Prison.  Respondent has answered, and Walden has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On September 26, 2012, Walden was charged with murder (Count 1), vehicular
manslaughter (Count 2), causing a vehicular accident resulting in death or permanent, serious
injury to another person and failing to stop at the scene (Count 3), driving a motor vehicle with a
suspended license (Counts 4, 6), and driving under the influence ("DUI") (Count 5).  As to
Counts 1 and 2, the information charged Walden with enhancements for personally inflicting
great bodily injury and fleeing the scene of a crime.  As to Count 5, the information alleged that
Walden had two prior DUI convictions in the last 10 years.

---

[1]     Patrick Covello is substituted for J. Lizarraga as Warden, Mule Creek State
Prison.  Fed. R. Civ. P. 25(d).

The charges stemmed from an incident where Walden, while driving fast through a residential neighborhood at night, struck G.W., H.L.-R., and G.W.'s four dogs and then fled without stopping.  G.W. sustained serious injuries, and the four dogs were killed.  H.L.-R.'s leg was severed, and he later died from his injuries.  Walden was arrested three days after the collision.  The arresting officer concluded that Walden was under the influence of marijuana and possibly another drug at the time of arrest.

Walden pled not guilty, denied the allegations, and proceeded to a jury trial.  During trial, the court granted the State's motion to dismiss counts 4 and 6 for insufficient evidence.  On direct appeal of his conviction, the California Court of Appeal summarized the following facts underlying the charges against Walden and the evidence presented at trial:

### The People's Case-in-chief

**The Collision**

G.W. lived on Garfield Avenue in Carmichael. She was dating H.L.-R. G.W. had four Australian cattle dogs.  On the evening of July 16, 2012,[FN3] G.W. and H.L.-R. were at an elementary school park near G.W.'s house so that the dogs could play.  Because it was after dark, the dogs were wearing reflective collars and were on reflective leashes.

> FN3.   Unless otherwise noted, witnesses who testified about the collision
> testified about events that took place during the night of July 16, 2012.

On their return walk to G.W.'s house, they stopped at the intersection of Garfield Avenue and Engle Road, where G.W. and H.L.-R. looked both ways before attempting to cross Garfield.  The intersection was well-lit, with lighting emanating from the school, house porch lights, and a street light.  G.W. observed headlights in the distance, but, based on the how far away the car was, she decided to cross the street.  Before she reached the middle of the street, G.W. saw the car change direction slightly, and then the car crashed into a stop sign as it entered the intersection, sending the stop sign flying into the air.  The car continued coming towards them. H.L.-R. shoved G.W. forward, attempting to push her out of the way.  The last thing G.W. remembered was H.L.-R. pushing her and the sound of the car's engine, which sounded as though it "was going full throttle."  G.W. blacked out.  She did not feel any impact.

G.W. awoke in the street.  She stood for a moment until her leg gave out because it was broken.  G.W. looked at H.L.-R. and realized that his severed leg was in the gutter.

Her dogs were lying on various locations on the street and she noticed one of them was bloody.  She screamed for help.

Phillip Givant lived nearby.  At approximately 9:55 p.m., Phillip and his 17-year-old daughter, Taylor,[FN4] were driving home.  As they approached the intersection of Garfield Avenue and Engle Road, Phillip saw a car run into a stop sign, causing the stop sign to "explode."  Phillip did not hear any braking or squealing of tires.  Phillip testified that the car was traveling very fast, more than 60 miles per hour.  He acknowledged that he told law enforcement on the night of the collision that the car was traveling at 75 to 90 miles per hour, and he testified that it would not shock him to learn that the car was indeed moving that fast.  Phillip had lived in the neighborhood for 50 years and he had never seen a car traveling as fast on Garfield as this car had been moving.  Taylor estimated that the vehicle was traveling at 80 to 90 miles per hour.

> FN4.   Because Phillip Givant and Taylor Givant both testified at trial, we refer to them by their given names to avoid confusion.

As the car traveled through the intersection, Phillip observed movement in the crosswalk.  Phillip heard an impact that sounded like people being struck by the car. Taylor did not see the impact, but she saw people in the street after they were hit.

Taylor "went ballistic" and told Phillip that there were people in the street.  Phillip knew people had been hit by the car and that they would need help, but he was also concerned for Taylor, who was hysterical.  Phillip drove home, which took a matter of seconds, and directed Taylor to go inside.  Phillip then sprinted back to the scene of the collision, which took less than a minute.  Phillip and Taylor both tried to call 911, but did not get through.

Jeffrey Gershanoff lived on Garfield approximately a half a block past the intersection.  At approximately 10:00 p.m., he heard a loud bang which he believed was the sound of a car hitting a stop sign.  He then heard two loud thumps, which he assumed to be the sound of a car hitting plastic garbage cans set out by the curb.  Gershanoff ran from inside his garage to the street in time to see a silver late-1980's Nissan or Toyota drive by.  Gershanoff testified that the car was traveling at 45 to 50 miles per hour.  He acknowledged that he told law enforcement in August 2012 that the car was traveling at 55 to 60 miles per hour.  However, he had revised his estimate because he figured that, if a car was traveling at 55 to 60 miles per hour, it would have passed by before he could observe it.  He did recall thinking, "Man, this guy is flying.  This car is just flying by." (Italics omitted.)  The car did not have its headlights on, but the taillights were illuminated.  Gershanoff watched the car continue down the street approaching another intersection, expecting it to stop, but the car just "blew right through that stop sign."  The brake lights were never illuminated.  Gershanoff called 911.

Karen Garden and Marty Cook lived near the collision scene.  At approximately 10:00 p.m., Garden and Cook both heard "a pop, pop, real fast."  To Cook, it sounded like two two-by-fours hitting each other.  Then they heard screaming.  Neither Garden nor Cook thought it was a car accident because they did not hear the screeching of tires or a crash.  They ran outside; Garden ran ahead while Cook called 911.  At the scene of

the collision, Garden saw a stop sign in the roadway, and saw "a bunch of dogs" and a mirror in the street. She saw H.L.-R. attempting to get up, but "he didn't realize he didn't have a leg." He immediately fell back down. G.W. was screaming, "my babies, my babies" (italics omitted), but Garden did not see any children. As G.W. continued to scream about her babies, Garden asked if she was pregnant, and G.W. responded, "No. My dogs are my babies." (Italics omitted.) Garden turned her attention to H.L.-R. She told H.L.-R. he was bleeding badly, and she covered his leg from view. Using a neighbor's belt to fashion a tourniquet, Garden wrapped it around H.L.-R.'s leg. Approximately three minutes after Garden arrived on the scene, emergency personnel arrived.

**The Victims' Injuries**

H.L.-R. sustained a traumatic amputation of the lower leg, a fracture dislocation of the pelvis in multiple locations, an injury near his buttocks, significant injuries to both his small and large intestines which required surgeons to remove portions and staple the ends off pending additional procedures at a later date, and substantial bleeding. Surgeons performed a number of procedures on H.L.-R. over the course of the next several days. During the night of July 28, 2012, as physicians were attempting to diagnose and treat internal bleeding, H.L.-R. went into abrupt cardiac arrest. The team worked on H.R., but to no avail and he died.

G.W. sustained two fractured bones in her lower left leg. She also sustained scratches on her left side where she had been struck by a piece of the stop sign. She remained in the hospital for several days, and required surgery on her leg, including the insertion of a metal rod with screws holding it in place.

**Pre-Arrest Investigation**

The speed limit on Garfield is 35 miles per hour. There is one lane each way. It was clear, warm, and dry on the night of the collision.

California Highway Patrol Officer David Longo responded to the intersection at approximately 10:15 p.m. G.W. and H.L.-R. had already been evacuated to the hospital. Longo observed pools of blood and other fluids, flesh, car parts, and other debris; the debris field spanned a distance of 300 feet. Longo looked at the scene from the first point of impact—the sheared-off stop sign—through the intersection, and he did not observe any skid marks or other signs of tire friction in the area of the crosswalk where G.W. and H.L.-R. were struck or throughout the entire crime scene. Vehicle debris at the crime scene included a vehicle's mirror, a light assembly, broken glass, and broken plastic parts. Based on the timing of several 911 calls, Longo determined that the collision occurred at approximately 10:00 p.m.

California Highway Patrol Officer James H. Wilkening worked with the major accident investigation team. As part of his job, Wilkening participated in the reconstruction of traffic collisions. On the night of the collision, Wilkening was dispatched to the scene. He characterized the scene of the collision as "rather lengthy." It spanned a distance of approximately 300 feet beyond the intersection. Wilkening testified that the main portion of the stop sign, which had been sheared off, came to rest

approximately 65 feet from where it had been installed.  There was an additional piece of
wood from the sign that Wilkening located even farther away.  Wilkening also testified
that H.L.-R.'s severed leg came to rest approximately 60 to 70 feet from where the
vehicle struck him.  According to Wilkening's measurements, the four dogs came to rest
at various points between 45 and 125 feet from the point of impact.  Wilkening testified
that the general area of the debris field was approximately 175 feet long, and further that,
from the initial point of impact to the farthest-away documented item of evidence was a
distance of approximately 318 feet.

Longo took the auto parts recovered from the crime scene to a Nissan dealership.
A parts manager viewed several of the car parts, including a mirror, a side marker light,
and a piece of a front valance panel.  Based on his examination, the parts manager stated
that law enforcement should look for a two-tone gray 1986 or 1987 Nissan Maxima.
Using that information, as well as a list of registered vehicle owners, Longo ultimately
began to focus his investigation on [Walden].

**[Walden's] Activities Before and After the Collision**

Cody Miller and his girlfriend Gina Wolverton[FN5] were friends with [Walden] in
July 2012.  At the time of [Walden's] arrest, Miller had known [Walden] for two to three
months.[FN6]  Wolverton had known [Walden] for approximately six months.  At the time,
Miller was using heroin and Xanax.  Xanax enhances or elevates the effect of heroin.
According to Miller, [Walden] was using heroin, methamphetamine, and marijuana.
[Walden] was also using Xanax and would sometimes ask Miller for the drug, but
normally bought it from a mutual friend.  Miller also heard [Walden] speak of using
methadone.  Wolverton testified that she had observed [Walden] inject heroin.  He was a
daily user.

> FN5.   At the time of her testimony, Wolverton was incarcerated for petty theft, a
> violation of the terms of her probation.  She testified under a grant of
> immunity.

> FN6.   Miller also testified under a grant of immunity.

Miller testified that, for a brief, three-week period prior to [Walden's] arrest,
Miller saw [Walden] every day or every other day.  [Walden] was living in a shed behind
his mother's house in Carmichael.  Miller and Wolverton would often spend the night
there with [Walden].  They would do drugs together, usually heroin.  At the beginning of
July 2012, [Walden] told Miller and Wolverton that he was going to North Carolina to
see a girl.  In preparing for the trip, [Walden] asked Wolverton if she knew where to
obtain methadone pills, but she told him she did not.  According to Wolverton, [Walden]
was saving money to buy a large quantity of heroin for the trip so he could "stay well."
(Italics omitted.)  In an interview, Wolverton told Longo that, prior to leaving for North
Carolina, [Walden] was stealing lawn fountains and other items and selling them in order
to make money to buy methadone and heroin for his trip.

Geraldine Kay Kemp, [Walden's] mother, acknowledged that [Walden] has had a substance abuse problem for 10 to 15 years.  With regard to his trip to North Carolina, Kemp testified that [Walden] took his Nissan Maxima on his trip in July 2012.  No one drove that car other than [Walden].  Kemp remained in daily contact with [Walden] by phone while he was away.  [Walden] would sometimes ask Kemp to send him money.  She estimated that, during [Walden's] trip, she sent him a total of approximately $1,500 by Western Union.

At some point on his trip to North Carolina, [Walden] called Kemp and told her that he was in jail in Nebraska and that his car had been impounded.[FN7]  Kemp sent more than $600 for bail and so that [Walden] could retrieve his car.  She believed that [Walden] spent two or three days in jail.  [Walden] contacted Kemp after he got out of jail and stated that he was continuing to North Carolina.  Approximately a week after he arrived in North Carolina, [Walden] told Kemp that he planned to return to California.  It took [Walden] approximately three or three and a half days to get back to California.

> FN7.   Law enforcement in Nebraska noticed that the vehicle had a broken tail light and the passenger side mirror was affixed with a wire, but there was no major damage to [Walden's] car at that time.

Kemp testified that she was in contact with [Walden] much of the day as he was driving back to Sacramento.  At 6:57 p.m. on the evening of the collision, Kemp sent one last wire transfer of $20 to [Walden] in Auburn, California.  Kemp testified that she spoke with [Walden] "in the earlier evening areas and he was in Sacramento at a friend's house."  Asked what time this occurred, Kemp responded, "I couldn't give you any accurate time, per se, but I would guess 8:00, 9:00."

At approximately sunset on the day of the collision, Miller and Wolverton were at a friend's house when [Walden] called to say that he was on his way back to town.[FN8]  [Walden] called again later in the evening.  In one of their telephone conversations, [Walden] asked Miller to obtain some heroin for him, and Miller agreed to try.  Wolverton testified that [Walden] sounded stressed out and desperate.[FN9]  He was asking if Miller and Wolverton had any heroin.  Miller and Wolverton later told [Walden] that they had been unable to obtain any heroin, and, according to Miller, [Walden] responded that he would try to get some and would call Miller back after he did so.  According to Wolverton, after she and Miller did manage to obtain some heroin, she called [Walden] and notified him.  Miller testified that they did not obtain heroin for [Walden], although Miller did acquire heroin for himself and Wolverton.  [Walden] said that he was going to get "some" or some "stuff," by which Miller assumed [Walden] meant heroin.  At some point after Miller and Wolverton had obtained heroin, Wolverton asked [Walden] if he needed any, and [Walden] stated that he did not.

> FN8.   Cell phone records show calls from [Walden] to Miller's phone at 8:43 p.m. (6 min. 33 seconds), 9:00 p.m. lasting (52 seconds), 9:19 p.m. (2 mins. 53 seconds), 10:11 p.m. (51 seconds), and 10:27 p.m. (1 min. 41 seconds).  At 10:29 p.m. Miller's phone called [Walden] (3 mins. 19

seconds).  [Walden's] phone called Miller's phone again at 10:41 p.m. (1 min. 24 seconds) and 10:49 p.m. (1 min. 41 seconds).

FN9.   As set forth, post, in her interview with Longo, Wolverton stated that [Walden] sounded "desperate."  However, when she testified at trial, she stated: "I feel stressed out is a more accurate word for it."

Sometime after 10:00 p.m., [Walden] called Miller again and stated that he needed help with his car.  The cell phone records show a call from [Walden] to Miller at 10:11 p.m.  [Walden] stated that he was at Garfield and El Camino and his car needed to be jumpstarted.  Approximately 20 minutes later, Miller and Wolverton arrived in the vicinity and saw police caution tape blocking off the area.  They assumed police were operating a DUI checkpoint.  [Walden] subsequently called again and stated that he did not need a jump anymore and that he managed to get his car started.  [Walden] told Miller that the battery cable had come off of the battery.  Miller agreed to meet [Walden] at [Walden's] mother's house.

Miller and Wolverton arrived at [Walden's] mother's house, but [Walden] was not there yet.  They called him, and he stated that he would be there in 20 minutes.  Approximately 40 minutes later, [Walden] arrived.  As Miller approached [Walden's] car, he noticed that there were more cracks in the windshield than there were before, and that there were dents in the side of the car.  Wolverton asked [Walden] what had happened to his light because his light was broken.  As they walked back to his shed, [Walden]  "nonchalantly said he might have hit a dog or something."  Wolverton told Longo in an interview that, in her opinion, [Walden] was under the influence of heroin at that point because he was not sick.  However, she testified at trial that "when I was answering [Longo's] question about that night, I was taking it in terms of that night, not when he arrived at that moment."  Miller told Longo in an interview that it appeared that [Walden]  was under the influence of heroin when he arrived, but at trial Miller testified that [Walden] looked sick, as if he had not yet done heroin.  Miller testified that [Walden] told him that he had obtained methadone from a girlfriend while in North Carolina.

[Walden], Miller, and Wolverton went back to [Walden's] shed.  Miller asked [Walden] what happened to his car, and [Walden] said that "a dog and a guy stepped out in front of his car."  [Walden] told Miller that he hit the man and the dog, and that the impact knocked off his side mirror.  Miller had noticed the mirror was missing.  Miller testified that he did not consider calling the police about the collision because "whatever it was [Miller] didn't want to have anything to do with it."  About 15 to 20 minutes after arriving in the shed, the three of them shot up heroin, and then they went to sleep.

The next morning, Wolverton, who woke up early to go to the methadone clinic and to go to McDonald's before breakfast service ended, noticed that [Walden's] driver's-side mirror was missing.  When Miller awoke later, [Walden] was outside washing his car.  There were dents on several parts of the car, including the front fender, the driver's side, and on the roof.  The dent on the roof was red.  Miller also observed a boot print or something similar.  Miller asked [Walden] what he had struck, because it looked to Miller as though [Walden] hit more than a man and a dog.  Miller did not

remember if [Walden] responded.  Miller asked [Walden] what he was doing in the area where the collision occurred.  [Walden] responded that he was going to pick up heroin. Miller assisted [Walden] in getting some of the dents out of the car.  Underneath the car, Miller saw what looked like dog hair.  When Wolverton returned, she saw Miller attempting to fix the light on [Walden's] car.  She also noticed dents on the hood and on the side of the car.

In the days following the collision, Miller suggested [Walden] turn himself in to law enforcement.  According to Miller, [Walden] responded: "it is what it is, you know. I guess . . . when they find me, they'll find me."

When Longo interviewed Miller, Miller stated that, in one phone conversation he had with [Walden] on the day of the collision, [Walden] stated that he was "looking for some stuff," meaning heroin.  Miller indicated that he, too, was looking for heroin and that he would make a call on [Walden's] behalf.  In a subsequent call, [Walden] told Miller that he would "get [his] own stuff." (Italics omitted.)

Longo's interview with Wolverton was recorded and played for the jury. Wolverton told Longo that she, Miller, and [Walden] used to shoot heroin together. Wolverton told Longo that, sometimes [Walden] would nod off or fall asleep immediately after injecting heroin.  He would also do Xanax at the same time to enhance the high.  Wolverton told Longo that, when she first spoke with [Walden] on the phone on the day of the collision, he stated that he was looking for heroin, and he sounded sick and like he was going through withdrawal.  He had called "everybody in town" looking for heroin, including people who had gone to jail and people who were no longer selling heroin.  He was "absolutely desperate" to obtain heroin, and he told Wolverton he had been "'sick for five days.'"  Later in the evening, when Wolverton talked to [Walden] on the phone and told him that she and Miller "got a little something," [Walden] told her to meet him at his house, and stated, "'I'm getting something too.'"  When they later met up at [Walden's] house and Wolverton saw that the light on [Walden's] car was smashed, she asked what happened and whether he had hit a deer, and [Walden] responded, nonchalantly, "'Just a dog or two.'"  However, when Wolverton entered the shed after retrieving her "high kit" from her car, Miller told her that [Walden], who had stepped outside for a moment, had told him "'he hit a - a guy and a dog jumped out in front of him.'"  While they were in the shed, Wolverton saw [Walden] pull heroin, Xanax, and methamphetamine out of his pockets and place the drugs on the bed.  As they prepared the heroin, [Walden] told her and Miller that he had gotten "a really good deal on this really good shit and we need to try it."  They swapped some heroin and then they all injected heroin.  Longo asked Wolverton how [Walden] seemed before they injected heroin together, and she responded: "He looked like shit.  But he wasn't, he had already done some dope."  Wolverton told Longo that, although he "looked like shit," she "could tell that he was well."

## [Walden's] Arrest

On the evening of July 18, 2012, [Walden] went to his shed at approximately 5:00 or 6:00 p.m.  Kemp received a phone call from her daughter at approximately 1:00 a.m. She told Kemp that law enforcement had just been at her boyfriend's home in Citrus

Heights looking for [Walden] in connection with a hit-and-run. Kemp went to the shed and told [Walden] that law enforcement was looking to talk with him about a hit-and-run. [Walden] gathered some items and immediately went to his car. Kemp returned to her house. Five to ten minutes later, Kemp realized that there were flashing lights out front. She went to the front of the house and saw that officers had [Walden] in handcuffs.

California Highway Patrol Officer Steve Rista testified that on July 19, 2012, just after midnight, he went to a location looking for [Walden] and his vehicle. As Rista arrived, the vehicle, a 1987 Nissan Maxima, began to pull out of the driveway. They stopped the vehicle, which was being driven by [Walden], and instructed him to get out.

Based on his observations and the results of field sobriety testing, Rista concluded that [Walden] was under the influence of marijuana, and possibly of another drug "cocktail." On cross-examination, Rista acknowledged that nothing about the way [Walden] drove his vehicle prior to the stop contributed to his conclusion that [Walden] was under the influence of a drug.[FN10]

> FN10. We discuss Officer Rista's driving under the influence investigation and the subsequent drug testing in more detail post, in our discussion of [Walden's] insufficiency of the evidence claim related to count five, driving under the influence of a drug.

Observing [Walden's] car, Rista noticed that its driver's side mirror was missing, there was a dent in the roof, and it appeared that it had been recently washed. Rista also observed what appeared to be hair and blood on the underside of the car. [Walden] was arrested, and his car towed and impounded.

**Post-arrest Investigation**

Longo processed [Walden's] vehicle for evidence. The driver's-side light assembly was missing, as was the left turn signal assembly. The driver's-side mirror was also missing. Longo observed dents in the vehicle, some of which appeared to have been pounded out. There were red streaks to the rear of the sunroof and underneath the front bumper which Longo believed to be dried blood. There was another red streak in the middle of the car's hood, which Longo believed to be from the red paint from the stop sign. The sunroof contained a series of cracks, and there was an indentation in the roof. There was also hair or fibers imbedded in parts of the vehicle including the undercarriage. It appeared to Longo that the vehicle had been washed recently. Longo placed auto parts recovered from the crime scene on their respective locations on [Walden's] vehicle. He was certain that the parts collected at the crime scene belonged to [Walden's] vehicle.

Longo obtained [Walden's] mobile phone records. One telephone number [Walden] called near the time of the collision was associated with Miller. Another number [Walden] called near the time of the collision was associated with Duane Graham, who lived in an apartment complex on Sutter Avenue in Carmichael and was a drug dealer from whom [Walden] had purchased heroin in the past. Another number was associated with Kemp. At 9:59 p.m., [Walden] received a call from his mother that lasted

one minute 40 seconds.  That call was received by a cell phone tower on Engle Road in Carmichael.  [Walden's] mother acknowledged that she had called [Walden], but denied hearing a collision during the conversation.

Longo searched the shed where [Walden] stayed.  Among other items he discovered was a black pouch containing a spoon and two hypodermic needles and syringes.

California Highway Patrol Officer Dominic Blancarte was assigned to the red light camera program in the unincorporated portions of Sacramento County.  According to Blancarte, the video cameras used in the program continuously operate, and an officer with access to the system can obtain video recorded by any of the program's cameras on a given date at a specified time and location.  Longo asked Blancarte to obtain the footage recorded by the camera at the intersection of Manzanita and Cypress on July 16, 2012, between 9:45 and 10:00 p.m., which he did.  Longo received a disc from Blancarte containing the video footage.  Longo testified that, viewing the video, he observed a vehicle pass through the intersection that he believed to be [Walden's] car.  That vehicle can be seen passing through the intersection at 9:57.  It was traveling at a normal rate of speed.

Officers were unable to determine the speed of the car that struck G.W. and H.L.-R. at the time of impact because of the absence of markings on the road surface.

**[Walden's] Phone Call to his Mother from Jail**

On July 20, 2012, Kemp had a telephone conversation with [Walden] while he was in custody at the jail.  That conversation was recorded.  In accordance with a ruling of the court concerning the admissibility of the evidence, only a portion of the conversation was played for the jury.  In that portion of the call, Kemp told [Walden] "they're saying you ran at a stop sign at 80 miles an hour."  [Walden] responded: "Well, I wasn't going 80.  I was going a little fast like 65, but also too, you got to remember I've been used to going 65, 75 miles an hour straight for three days, after the speed limit." [Walden] continued, "you ever notice that when you be driving down the- on the, you know, on the freeway for a long time and then you get off on the surface streets, it seems like it's so slow because you're so used to going 65, 70 miles an hour, you know what I mean?"  When Kemp said, "that doesn't make it right," [Walden] responded, "It doesn't make it right, but I mean, you know, you've done it haven't you?  Got off the freeway and then like, oh shoot, I'm going kind of fast here."

**[Walden's] Case**

Sally Richardson, a private investigator, conducted a driving-time experiment, driving from the location of the red light camera at the intersection of Manzanita and Cypress to the intersection of Garfield and Engle where the collision took place.  The driving distance was approximately one mile.  At 9:40 p.m., driving at the speed limit of 35 miles per hour in "medium/light" traffic, the drive took her two minutes 51 seconds. She drove the same route five more times at a fairly constant rate of speed (no more than 40 miles per hour) with results ranging up to four minutes total driving time.  She

stopped for periods of time at the two stop lights and one stop sign between the two intersections.

Larry Fink testified as an expert in the field of traffic accident diagrams, calculating the distance a vehicle travels in a specified period of time, and the amount of time it takes drivers to perceive and react to stimuli. Based on his calculus involving speed and reaction time, Fink testified, in essence, that an operator driving a vehicle at any speed between 35 and 90 miles per hour who first perceived danger at the stop sign [Walden] hit would be beyond the crosswalk where G.W. and H.L.-R. were struck before the driver would have sufficient time to react. On cross examination, Fink acknowledged that the 1.5 and 1.6 second reaction times upon which he relied were based on reactions of "normal perception-reaction times of reasonably sober people" as opposed to people under the influence of drugs or alcohol. He also acknowledged that most drivers would swerve or slam on their breaks once they perceived a danger in the road.

[Walden] testified and admitted that he was the driver of the car that struck H.L.-R. and G.W. He said he did not intend to hit them. [Walden] told the jury: "Although, I've said different things to different people including law enforcement, the truth is I fell asleep at the wheel." He said he was very tired from his three and a half day cross-country trip. [Walden] could not estimate his speed at the time of the collision because he had fallen asleep.

[Walden] testified that he was not under the influence of heroin at the time of the collision. According to [Walden], at the time of the collision, he had not used heroin since the end of June or beginning of July 2012. He denied being under the influence of any drug, medication, or alcohol at the time of the collision.

[Walden] also testified that he was not talking on a cell phone at the time of the collision. He told the jury that five to ten seconds after the collision, his cell phone rang and he spoke on the phone with his mother.

[Walden] testified that he started using illegal drugs when he was 17 or 18 years old. He began using heroin when he was about 20 years old. He continued to use heroin and occasionally methadone over the next 11 years. He also used methamphetamine. In the six months leading up to the time of the collision, [Walden] was using methadone, heroin, marijuana, benzodiazepines, and methamphetamine. He used either heroin or methadone every day.

[Walden] discussed the incident in Nebraska during his trip to North Carolina. He testified that he had pulled off at an exit to sleep, but the location where he had stopped was private property. Law enforcement woke him up and asked if he had any drugs in the car, and, when he admitted that he did, they searched his car and arrested him. [Walden] was detained from July 3 to July 5, 2012, when his mother sent money to bail him out. He retrieved his car from the impound lot and continued on to North Carolina. Having failed to find work in North Carolina, defendant decided to return to California. He began his return trip on July 13. [Walden] testified that he did not have any drugs with him on the trip from North Carolina to California or when he entered California.

[Walden's] first stop in California was at a K-Mart in Auburn, where he stopped to wrap a burst hose on his car with tape and to refill the radiator. [Walden] had his

11

mother send him $20 in Auburn in case he needed to spend more on car repairs before he made it to Sacramento.  He collected the money from a Safeway store at 6:57 p.m. [Walden] testified that when he left Auburn for Sacramento, he did not have heroin, methadone, methamphetamine, Xanax, or marijuana, nor had he used any of those substances up to that point on July 16, 2012.  He said had not used heroin since before he left California for North Carolina.

[Walden's] plan was that, if his car made it back to Sacramento, he would get together with Miller and Wolverton and do heroin.  He called them to see if they were available.  At approximately 9:00 p.m., he called them again to see if they had or could obtain any heroin.  On cross-examination, [Walden] acknowledged that he also called Graham, a drug dealer from whom defendant had purchased heroin in the past.  Graham lived at an apartment on Sutter Avenue in Carmichael.  [Walden] had five phone conversations with Graham that night prior to the collision.  According to the phone records, these took place at 6:16, 8:32, 8:34, 8:56, and 9:12.  [Walden] testified that at the time of the 9:12 call, he was "right near" Graham's residence.  Earlier on direct examination, [Walden] testified he did not remember if he spoke to Graham or left a voicemail at that time.  On cross-examination he admitted having a 45-second conversation with Graham at that time.  However, he denied seeing Graham on the night of the collision, and testified he did not purchase heroin or any other controlled substances from him that night.

At approximately 9:20 p.m., roughly 10 minutes after his last call to Graham, [Walden] stopped at a Rite Aid at the corner of Manzanita and Fair Oaks.  He walked around the store waiting for the restroom to be available, used the restroom, and walked out of the store at 9:39 p.m., approximately 18 minutes after arriving.  [Walden] testified that, as of this time, he still had not obtained or used any heroin, marijuana, Xanax, benzodiazepines, or any illegal substances.  On cross-examination, [Walden] denied that he had obtained heroin prior to arriving at the Rite Aid on Manzanita and Fair Oaks, and he denied obtaining needles at that Rite Aid.[FN11]  [Walden] testified that at some point, he stopped at another Rite Aid, perhaps at Dewey and Auburn, to obtain needles, although he did so prior to knowing whether he was going to be able to obtain any heroin. [Walden] topped off the water and oil in his car in the Rite Aid parking lot at Manzanita and Fair Oaks, which accounted for 18 minutes he spent in the parking lot after walking out of Rite Aid, and thereafter he continued towards home.  [Walden] said he did not make any calls during the approximately 36 minutes that passed between his arrival at Rite Aid and his passing through the intersection as captured on the video camera.

> FN11.  Wolverton testified that, as a heroin addict, when she needed clean needles, she would go to Walgreens or certain Rite Aid locations.  Those stores sold generic brands of needles, which were inexpensive.

As of this time, [Walden] testified that he was no longer experiencing withdrawal symptoms, having experienced detoxification during the course of his trip to and from North Carolina. Defendant characterized his desire for heroin at this point as a "want" as opposed to a "need."

[Walden] testified that when he turned from Cypress onto Garfield, he was driving at a "[n]ormal rate of speed." By this time, [Walden] was "definitely tired." The last memory [Walden] had prior to the collision was accelerating after stopping at a stop sign on the corner of Gibbons and Garfield. [Walden] did not know how far he proceeded from the stop sign before falling asleep. [Walden's] next memory was of being awoken by a loud noise in front and on top of him. He did not know what the noise was, but he realized he had struck something. [Walden] did not know how fast his car was traveling. He focused his attention forward and saw what appeared to be a man and a dog almost directly in front of him. He perceived an impact almost instantaneously. [Walden] knew he had hit a dog, but he did not know whether he hit the man or not. He said he had felt a "small impact." He testified that it seemed as though striking the stop sign was a greater impact. When asked about his reactions and whether he attempted to brake the vehicle, [Walden] responded, "I'm not 100 percent sure. I -- I believe that I tried to tap on the brake and just move the wheel a little bit to the right. But I really don't know. Everything was so fast. I really don't know what I did."

After the second impact, [Walden] "was in panic mode." He knew he hit a dog, although he did not know whether he hit the man. [Walden] continued: "I was selfish in my thinking. I didn't have a license. I don't like to be around police. And at that moment I made the decision to leave." [Walden] testified that he neither applied the brakes nor increased his speed, but maintained the same speed. [Walden] estimated that, as he continued on Garfield, he was traveling between 40 and 50 miles per hour. He ran through the next stop sign because he "just wanted to get out of there." When his mother called almost immediately after the collision, [Walden] did not mention what had happened.

At the intersection of El Camino and Garfield, [Walden] pulled into a retirement home to inspect his car. He observed dents on the front driver's side and on the hood, that a light was missing, and that the sunroof was shattered. At that point, [Walden] grew more scared, realizing that he may have hit the man. When [Walden] attempted to leave, his car would not start. Believing the problem was a battery-related issue, [Walden] called Miller to see if he could jumpstart [Walden's] car. Subsequently, [Walden] opened the hood and saw that the positive cable had come off of the battery terminal. He replaced it, and the car started. [Walden] called Miller and told him that he had managed to get his car started. In a subsequent call, [Walden] agreed to meet Miller and Wolverton at [Walden's] house.

[Walden] testified that, when he left the retirement home, he went to a nearby apartment complex at Watt and Whitney and purchased a half gram of "lower end" heroin. This location was between Carmichael and North Highlands, closer to where his mother lived. [Walden] then drove to his mother's house. Upon his arrival, [Walden] saw that Miller and Wolverton were already there. [Walden] went into his mother's house and briefly spoke with her. He then went to the shed, and he, Miller, and Wolverton went in and began preparing heroin. [Walden] testified that, other than the heroin he just bought, he did not have any other controlled substances. The three of them used their heroin, [Walden] talked to Miller for a while, and then [Walden] fell asleep.

The next morning, [Walden] talked to Miller and then went to clean his car. [Walden] washed his car, and Miller helped him remove some dents out.

[Walden] used heroin again on the morning of July 17, 2012.  On the morning of July 18, 2012, [Walden] again used heroin.  That evening, [Walden] took Xanax pills and smoked two hits of marijuana.

On the night of July 18, 2012, [Walden] went to sleep at 8:00 or 8:30 p.m.  He slept for four and a half or five hours, and then woke up to his mother knocking on the door of the shed stating that the police were looking for him.  [Walden] grabbed his keys and cell phone and got into his car.  By that time, he was not feeling the effects of the heroin, marijuana, or Xanax he had taken during the course of the day on July 18.  However, he was tired because he had just woken up.  [Walden] started his car and backed up.  He then saw the police.  He began to pull away, hoping that he could sneak by them.  Police almost immediately pulled [Walden] over.

An officer asked [Walden] to perform field sobriety tests and subsequently placed him under arrest.  Police took [Walden] to a police station, where a blood sample was drawn from him.

On cross-examination, [Walden] admitted that he was convicted of driving under the influence of drugs in 2001, 2003, and 2005.  [Walden] acknowledged that he had been ordered to a diversion program in 2003 in which he learned about the dangers of his lifestyle as an addict and how his conduct was dangerous to the lives of others.  He was twice enrolled in an SB 38 program following his DUI convictions, where he learned about the dangers of his drug use.  Both his mother and his ex-wife tried to get defendant to stop using drugs.

[Walden] acknowledged that his account of the night of the collision at trial was very different from what he initially told law enforcement.  He also answered questions concerning the jailhouse call he placed to Kemp.  He stated that there was more to the call than was played for the jury during the People's case-in-chief.  [Walden] testified that, during the phone call, he made several references to Kemp about having fallen asleep or nodded off while driving, and that he woke up when his car struck the stop sign.

**Prosecution's Rebuttal Evidence**

        The video of [Walden's] interview with Longo was played for the jury during the prosecution's rebuttal.  We reference its contents, post, in our discussion of [Walden's] contention that this evidence should have been suppressed, even for impeachment purposes.

*People v. Walden*, No. C076697, 2018 WL 4091015, at \*2-12 (Cal. Ct. App. Aug. 28, 2018).

At the conclusion of trial, the jury found Walden guilty of the remaining counts (Counts 1, 2, 3, 5).  As to Counts 1 and 2, the jury found true enhancement allegations that, in the commission of the respective crimes, Walden personally inflicted great bodily injury on G.W., and that he fled the scene of an accident.  The jury also found true as to Count 5 (driving under the influence) that Walden had sustained two prior convictions of driving under the influence of a drug within the prior 10 years.  The trial court subsequently sentenced Walden to an aggregate term of 9 years 18 months' imprisonment consecutive to an indeterminate term on Count 1 of 15 years to life imprisonment.

Through counsel, Walden appealed his conviction, arguing that: 1) the trial court erred in admitting unduly prejudicial evidence of his prior drug-related convictions; 2) the trial court erred in admitting his confession to law enforcement because the statement was obtained in violation of his right to counsel and coerced through threats and promises of leniency; 3) the trial court erred in instructing the jury that it could consider for purposes of assessing his credibility his prior DUI convictions; 4) the prosecutor committed misconduct by trivializing the burden of proof; 5) the evidence was legally insufficient to support his DUI conviction (Count 5); 6) the judgment should be reversed due to the cumulative effect of trial errors; 7) the great bodily injury enhancements imposed on Counts 1 and 2 must be stricken because they do not apply to convictions for murder or manslaughter; 8) the enhancement imposed on Count 1 for fleeing the

scene of an accident must be stricken because it does not apply to a murder conviction; and 9)

the trial court committed reversible error by failing to *sua sponte* give a unanimity instruction

because the prosecution at trial presented two separate factual theories of Walden's guilt of

implied malice murder.  In a reasoned, unpublished opinion issued on August 28, 2018, the

Court of Appeal agreed that the enhancements on Counts 1 and 2 for great bodily injury and

fleeing the scene of an accident must be stricken, and modified the judgment accordingly.

*Walden*, 2018 WL 4091015, at *44, 45, 46.  The appellate court also determined that the trial

court imposed an unauthorized sentence as to Count 2, which was raised by neither Walden or

Respondent, and modified the judgment to correct that error as well.  *Id.* at *44-45.  The Court of

Appeal unanimously affirmed the judgment against Walden in all other respects.  *Id.* at *46.

Walden petitioned in the California Supreme Court for review of all claims unsuccessfully raised

before the Court of Appeal, which was denied without comment on November 28, 2018.

Walden then timely filed in this Court a *pro se* Petition for a Writ of Habeas Corpus in

this Court on July 3, 2019.  Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2).  Briefing

on this case is now complete, and the matter is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Walden argues, as he did before the state courts

on direct appeal, that: 1) there was insufficient evidence to sustain his DUI conviction; 2) the

trial court erred in admitting his confession to law enforcement because the statement was

obtained in violation of his right to counsel and coerced through threats and promises of

leniency; 3) the trial court erred in admitting unduly prejudicial evidence of his prior drug-

related convictions and conduct; 4) the trial court erred in instructing the jury that it could

16

consider for purposes of assessing his credibility his prior DUI convictions; 5) the prosecutor committed misconduct by trivializing the burden of proof; 6) the great bodily injury enhancements imposed on Counts 1 and 2 must be stricken because they do not apply to convictions for murder or manslaughter; 7) the enhancement imposed on Count 1 for fleeing the scene of an accident must be stricken because it does not apply to a murder conviction; 8) the cumulative effect of the errors warrants reversal of his conviction; and 9) the trial court committed reversible error by failing to *sua sponte* give a unanimity instruction because the prosecution at trial presented two separate factual theories of Walden's guilt of implied malice murder.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  The term unreasonable is a common term in the legal world.  The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating

17

whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication

on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under

the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner

rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v.*

*Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.  *Insufficiency of the Evidence* (Ground 1)

Walden first argues that the prosecution's evidence was legally insufficient to sustain his

DUI conviction.  As articulated by the Supreme Court in *Jackson*, the federal constitutional

standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis

in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).

This Court must therefore determine whether the California courts unreasonably applied

*Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by

considering how it would have resolved any conflicts in the evidence, made the inferences, or

considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a

record of historical facts that supports conflicting inferences," this Court "must presume–even if

it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in

favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority

for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id*. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court

20

decision was 'objectively unreasonable.'"  *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

The California Court of Appeal explained the elements of the DUI conviction as follows:

> At the time of the offense, Vehicle Code section 23152, subdivision (a), read: "It is unlawful for any person who is under the influence of any alcoholic beverage or drug, or under the combined influence of any alcoholic beverage and drug, to drive a vehicle." (Former Veh. Code, § 23152, subd. (a), enacted by Stats. 1995, ch. 455, § 31, eff. Jan. 1, 1996.)  To prove a defendant guilty of driving under the influence of a drug, the People were required to prove (1) that the defendant drove a vehicle, and (2) that, when the defendant drove a vehicle, the defendant was under the influence of a drug.  "[F]or a defendant to be guilty of driving while under the influence of drugs in violation of Vehicle Code section 23152, subdivision (a), '"the . . . drug(s) must have so far affected the nervous system, the brain, or muscles [of the individual] as to impair to an appreciable degree the ability to operate a vehicle in a manner like that of an ordinarily prudent and cautious person in full possession of his faculties."'"

*Walden*, 2018 WL 4091015, at *40 (citations omitted).

In support of his challenge to the DUI conviction, Walden argues that the evidence was insufficient to establish that he was driving under the influence because a minimal amount of marijuana was found in his blood, along with a therapeutic dose of Xanax, and Rista's observations of Walden's field sobriety tests were inconclusive.  Petition at 21.  But this argument simply avers that the jury should have viewed the evidence differently; all of the evidence he identifies in support of his claim was before the jury for its assessment.  This Court is precluded from re-weighing the evidence.  *Schlup*, 513 U.S at 330.  As the Court of Appeal reasonably concluded:

> [T]here is substantial evidence in the record to support a finding beyond a reasonable doubt that, when he was pulled over shortly before his arrest, [Walden] was driving under the influence of a drug.
> After he pulled [Walden] over, Officer Rista detected a slight odor of marijuana emanating from [Walden].  [Walden] was "lethargic" and "[s]low in his movements," and his muscle tone appeared to Rista to be "placid," or loose and limp.  [Walden's] speech was also slow and lethargic.  [Walden's] eyes appeared glazed.  Rista thought that [Walden] could possibly be under the influence.  Upon inspection, Rista observed a green film on [Walden's] tongue and white blisters towards the back of [Walden's] tongue.

21

The green film indicated to Rista that [Walden] may have recently smoked marijuana. The whiteness and blisters indicated to Rista that [Walden] may recently have used methamphetamine. Rista observed that [Walden's] pupils were constricted or small. Rista also observed "rebound dilation," which is when the pupils constrict and then "bounce back up a little bit." Rista testified that rebound dilation is typically observed in someone who has used marijuana. [Walden] admitted that he had smoked two hits of marijuana four hours earlier. He also admitted that he had smoked methamphetamine, although he said that he had done that a week earlier.

Rista asked [Walden] to perform several field sobriety tests. Rista had [Walden] perform the "Romberg Test," which tests the subject's internal clock. During the performance of this test, [Walden] displayed eyelid tremors, and he swayed from side to side. According to Rista, eyelid tremors can be an objective sign of intoxication. At the time [Walden] estimated 30 seconds, 34 seconds had actually elapsed.

Rista then had [Walden] perform a "[o]ne-[l]eg [s]tand" test, requiring him to raise one foot while keeping his hands at his sides. He was then required to look at his toes and count out loud. [Walden] began performing the test before Rista finished explaining, demonstrating a sign that can indicate possible impairment, as subjects are instructed to wait until the officer finishes issuing instructions before beginning any test. When [Walden] began performing the one-leg stand, he began to lean back towards a chain link fence, moving his left hand back towards the fence to regain his balance. Before [Walden] started counting, he began hopping up and down. [Walden] began to hop on two occasions during the test, and he also raised his hands slightly from their position at his sides in order to maintain his balance.

Based on his observations, [Walden's] statements and the field sobriety testing, Rista concluded that [Walden] was under the influence of marijuana, and possibly of another drug "cocktail."

[Walden] submitted to a chemical blood test, which was performed at 2:13 a.m. According to criminalist Kristel Suchland, [Walden's] blood test indicated a presumptive positive result for benzodiazepines and for marijuana, and slightly positive result for opiates. However, the presence of opiates could not be confirmed. Suchland also testified that, if a user combined marijuana and a benzodiazepine, the substances combined can enhance the level of impairment in the user. The positive result for marijuana was confirmed by a subsequent testing technique, although the 1.3 nanograms per milliliter or less of marijuana detected was a "low amount . . . ."

Criminalist Kristen Burke detected 0.04 milligrams per liter of Xanax in [Walden's] sample, which would constitute "therapeutic level." She testified that, even at that level, the drug will still have an effect on the user's body. She testified that Xanax can have a sedating effect on the user, can diminish the user's ability to multitask, can divide the user's attention, can cause blurred vision, and can cause issues with balance.

Viewing this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the prosecution established both that [Walden] was under the influence of a drug and that he drove a vehicle while his ability to do so was impaired as a result. That [Walden] was under the influence of a drug, and that he was, as a result, impaired when operating his

vehicle, was supported by Rista's objective observations, his resulting opinions, [Walden's] performance of the field sobriety tests, the toxicology results, the criminalists' testimony concerning the effect of certain drugs, and defendant's admissions.

*Walden*, 2018 WL 4091015, at *41-42.

Although it might have been possible to draw a different inference from the totality of the evidence, this Court is required to resolve that conflict in favor of the prosecution. *See Jackson*, 443 U.S. at 326. Thus, considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA, this Court concludes that there was sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt that Walden was driving under the influence at the time of his arrest. Walden is therefore not entitled to relief on his insufficiency of the evidence claim.

B.      *Evidentiary Errors* (Grounds 2, 3)

Walden also argues that the trial court made two evidentiary errors. The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The erroneous admission of evidence does not provide a basis for federal habeas relief unless it rendered the trial fundamentally unfair in violation of due process. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Evidence violates due process only if "there

are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (emphasis omitted).  A writ of habeas corpus will be granted for an erroneous admission of evidence "only where the 'testimony is almost entirely unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.'" *Mancuso v. Olivarez*, 292 F.3d 939, 956 (9th Cir. 2002), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

     1.    *Coerced confession*

Walden alleges that the trial court erred in admitting certain incriminating statements he made to law enforcement because they were coerced by threats and express and implied promises of leniency, and law enforcement deflected his requests for counsel.  On direct appeal, the Court of Appeal agreed that the court admitted the statements but nonetheless found the error was harmless beyond a reasonable doubt.  The appellate court determined:

> The harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*), is applicable to error under the United States Constitution, including the erroneous admission of involuntary statements (*People v. Neal* (2003) 31 Cal.4th 63, 86 (*Neal*)).  "The beyond-a-reasonable-doubt standard of *Chapman* 'requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]  'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.]  Thus, the focus is what the jury actually decided and whether the error might have tainted its decision.  That is to say, the issue is 'whether the . . . verdict actually rendered in this trial was surely unattributable to the error.'" (*Neal*, at p. 86.)
>
> The prosecution's case-in-chief established that a car matching the description of [Walden's] sped through a stop sign and struck H.L.-R., G.W., and G.W.'s dogs.  A number of car parts, including the driver's-side mirror and a light assembly, were collected from the scene of the collision, and, according to Longo, they matched [Walden's] car perfectly.  [Walden's] vehicle was recorded on a red light video camera near the scene of the collision minutes before it occurred.
>
> [Walden], a long-time drug addict, was in the area of the collision that night to obtain heroin.  At some point prior to the time of the accident, [Walden] stated on a

phone call with Miller or Wolverton that he was going to get "some," or "some stuff," by which he meant heroin.  [Walden] spoke on the phone with Graham five times that night, at 6:16, 8:32, 8:34, 8:56, and 9:12.  At some point, [Walden] told Wolverton he no longer needed any heroin.  Shortly after the last phone call to Graham at 9:12, [Walden] arrived at a Rite Aid location near Graham's residence and near the scene of the collision, where he stayed for approximately 18 minutes.  Thereafter, he remained in the Rite Aid parking lot for another 18 minutes before resuming his journey.  Wolverton testified that Rite Aid was one of the locations where a heroin user could obtain generic needles inexpensively. After speaking with Miller on a call that began at 9:19, [Walden], who had been repeatedly placing calls looking for heroin throughout the evening, did not place any additional calls during the almost 40 minutes that passed between his arrival at Rite Aid and when he passed through the intersection as captured on the red light video camera.

When [Walden] arrived at home after the time of the collision, Miller observed that there were cracks in [Walden's] windshield that had not been there previously, and there were dents in the side of his car.  Wolverton noticed that [Walden's] light was broken.  Miller and Wolverton both noticed [Walden's] driver's-side mirror was missing. Miller asked [Walden] what happened to his car, and [Walden] responded "that a dog and a guy stepped out in front of his car."  [Walden] told Miller that he hit the man and the dog, and that the impact knocked off his side-view mirror.  Miller told Longo that, when he saw [Walden] that night, [Walden] "was not sick," meaning that he did not have the symptoms that an addict going through withdrawal would experience in the absence of drugs in his system.  Miller also told Longo that [Walden] looked well, meaning that [Walden] "had done some type of drugs."  Wolverton told Longo: "He looked like shit. But he wasn't, he had already done some dope."

The morning after the collision, Miller awoke to find [Walden] outside washing his car.  Miller asked [Walden] what he had struck, because it looked to Miller as though [Walden] hit more than a man and a dog.  There were dents on several parts of the car, including the front fender, the driver's side, and on the roof.  The dent on the roof was red.  Miller also observed a boot print or something similar.  Underneath the car, Miller saw what looked like dog hair.  Wolverton also noticed dents on the hood and on the side of [Walden's] car.  In the days following the collision, Miller suggested [Walden] turn himself in to law enforcement.  According to Miller, [Walden] responded: "it is what it is, you know.  I guess . . . when they find me, they'll find me."

In the portion of a jailhouse call [Walden] made to his mother that was admitted in the prosecution's case-in-chief, Kemp told [Walden] that "they're saying you ran at a stop sign at 80 miles an hour."  [Walden] responded: "Well, I wasn't going 80.  I was going a little fast like 65, but also too, you got to remember I've been used to going 65, 75 miles an hour straight for three days, after the speed limit."  [Walden] added, "[Y]ou ever notice that when you be driving down the- on the, you know, on the freeway for a long time and then you get off on the surface streets, it seems like it's so slow because you're so used to going 65, 70 miles an hour, you know what I mean?"  When Kemp observed, "[T]hat doesn't make it right," [Walden] responded, "It doesn't make it right, but I mean, you know, you've done it haven't you?  Got off the freeway and then like, oh shoot, I'm going kind of fast here."

When he testified on his own behalf, [Walden] admitted that he was the driver of the vehicle that struck H.L.-R., G.W., and G.W.'s dogs.  While he testified that he had simply fallen asleep at the wheel and denied having been under the influence of heroin or anything else at the time, he also acknowledged that he had proffered several different versions of what happened.

After the collision, [Walden] made the decision to continue driving and flee from the scene.  And he did so at a high rate of speed, intentionally running through a stop sign and evincing a consciousness of guilt.

We conclude, beyond a reasonable doubt, that the admission of [Walden's] statements to law enforcement in rebuttal did not contribute to the verdict.  (*Chapman*, supra, 386 U.S. at p. 24; *Neal*, supra, 31 Cal.4th at p. 86.)  In the context of the trial evidence, [Walden's] statements to Longo were unimportant in relation to the other evidence considered by the jury, marshaled above.  (*Yates v. Evatt* (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 449], *disapproved on another ground in Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn.4 [116 L.Ed.2d 385, 399, fn.4]; *Neal*, at p. 86.)  [Walden's] statement to Longo added little, if anything, to the trial evidence for the jury to consider.

In the interview, [Walden] admitted that he was driving "kinda fast not realizin' it 'cause [he was] used to it."  He also estimated his speed at 60 miles per hour.  These claims were already before the jury following the prosecution's case-in-chief as a result of, among other things, [Walden's] jailhouse phone conversation with his mother in which he stated that he "was going a little fast like 65," and that he had been used to driving fast because he had been driving at freeway speeds during his trip.

[Walden] told Longo he looked up and saw a man and a dog, that he swerved, that he thought he hit a dog but missed the man, and then "kept goin'."  These facts, too, were established in the prosecution's case-in-chief.  Miller asked [Walden] what happened to his car, and [Walden] responded "that a dog and a guy stepped out in front of his car," and that he hit the man and the dog and the impact knocked off his side-view mirror.  Because this evidence was already before the jury, [Walden's] additional statement to Longo that he told his mother that he thought he hit something but was not sure what did not add anything for the jury to consider.

[Walden] told Longo that he did not believe he ever applied his brakes and admitted leaving the scene.  However, the fact that the driver did not apply the vehicle's brakes was established through Longo's testimony concerning his observations at the scene, specifically that he did not observe skid marks or other indicators of friction in the area of the crosswalk where G.W. and H.L.-R. were struck.  Also, neighbors testified they did not hear the sound of a car skidding.  It was undisputed that the driver fled the scene.

[Walden] acknowledged to Longo in the interview that, the day after the collision, Miller "was tryin' to kinda get some of the dents out of the outside" of his car.  However, this was also already before the jury.  Miller himself admitted that, on the morning after the collision, he assisted [Walden] in getting some of the dents out of the car.  Wolverton saw Miller attempting to fix the light on [Walden's] vehicle.

In the interview, [Walden] admitted to a prior conviction of driving under the influence of a drug, his third.  However, evidence of [Walden's] prior convictions was already properly before the jury.

[Walden] told Longo that he did not consider turning himself in.  This sentiment was already before the jury, because [Walden] obviously did not turn himself in, and, when Miller urged [Walden] to do so, [Walden] responded: "it is what it is, you know.  I guess . . . when they find me, they'll find me."

In his statement to Longo, [Walden] stated that, at the time of the collision, he was looking down at "the Kearney, Nebraska," directions and "different phone numbers and stuff" because he had not heard from the girl he visited in North Carolina since he left. This is the only aspect of [Walden's] statement that added something not already before the jury.  [Walden] is correct that the jury had to decide if he acted with implied malice so as to support the murder count (§ 187, subd. (a) ), and, as to the vehicular manslaughter count (§ 192, subd. (c)(1) ), if he acted with gross negligence or with ordinary negligence. However, we conclude, beyond a reasonable doubt, that the admission of this statement in the prosecution's rebuttal case did not contribute to the verdict obtained on counts one and two.  (*Chapman*, *supra*, 386 U.S. at p. 24.)  As defense counsel argued in closing, [Walden] fabricated "a story that sounded better to him than falling asleep . . . *nonsensically claiming that he was looking for directions to Kearney, Nebraska, ten days after he left Nebraska while driving at 10:00 at night in Carmichael, California . . . .*" (Italics added.)  We conclude that there is no possibility that the jury convicted [Walden]  on the basis of this statement on the theory that he acted with implied malice or gross negligence by looking at these Nebraska directions and at "some phone numbers" at the time of the collision.

The admission of [Walden's] statement to Longo added nothing harmful to [Walden's] case that was not already before the jury.  Thus, the jury verdict rendered here was surely unattributable to the erroneous admission of [Walden's] statement to Longo in the People's rebuttal case.  (*See generally Neal*, *supra*, 31 Cal.4th at p. 86.)  While our high court has observed that "'the improper admission of a confession is much more likely to affect the outcome of a trial than are other categories of evidence, and thus is much more likely to be prejudicial . . .'" (*ibid.*, quoting *People v. Cahill* (1993) 5 Cal.4th 478, 503), under the particular circumstances of this case, the admission of [Walden's] statement was not prejudicial.  We conclude that the admission of [Walden's] statement to law enforcement in the prosecution's rebuttal case was harmless beyond a reasonable doubt.

*Walden*, 2018 WL 4091015, at *27-29.

The admission of an involuntary confession is likewise subject to harmless error analysis on federal habeas review.  *Arizona v. Fulminante*, 499 U.S. 279, 295-96 (1991).  The harmless error rule arises from the principle that a defendant is entitled to a fair trial, but not a perfect one.

*Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).  The United States Supreme Court has clarified that, when a state appellate court has undertaken a harmless error review under *Chapman v. California*, 386 U.S. 18 (1967), the federal district court reviewing the decision under § 2254 applies the harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *See Fry v. Pliler*, 551 U.S. 112, 120 (2007) ("*Brecht* obviously subsumes AEDPA/*Chapman* review").  Under *Brecht*, a federal habeas court that determines constitutional error occurred cannot grant a writ of habeas corpus unless the error "had substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at 638.  Under the *Brecht* harmlessness analysis, "if a judge is in grave doubt" about the effect of the error on the jury, the petitioner must prevail.  *O'Neal v. McAninch*, 513 U.S. 432, 438-39 (1995).

An independent review of the record reflects that the appellate court's harmless determination does not contravene or unreasonably apply Federal law.  The Court agrees that the wrongfully-admitted statements were not likely to have altered the outcome of Walden's case.  For the reasons thoroughly and persuasively explained by the Court of Appeal, the Court is convinced that the admission did not have a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638.  Walden is thus not entitled to relief based on the erroneous admission.

2.    *Prior drug-related convictions*

Walden additionally contends that the trial court erred in admitting evidence of his drug-related convictions and conduct.  According to Walden, that evidence was unduly prejudicial, confusing, and cumulative.  Walden avers that the trial court should have excluded the evidence under California Evidence Code § 352 as substantially more prejudicial than probative.  The

28

Court of Appeal disagreed, concluding on direct appeal that the trial court properly admitted the evidence. *Walden*, 2018 WL 4091015, at *15.

Walden fares no better on federal habeas review.[2]  Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules.  Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ."  *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009).  California employs a similar rule.  *See People v. Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings on the admissibility of evidence.").

Under these guidelines, this Court cannot find that the admission of his prior drug-related crimes was an abuse of discretion, or unreasonable or contrary to federal law.  Walden argues, as he did on direct appeal, that the trial court erred in its balancing under Evidence Code § 352 because the inflammatory and prejudicial nature of the evidence far outweighed its probative value given the remoteness and dissimilarity of the other conduct.  But to the extent Walden

---

[2]     Because Walden testified at trial and was impeached with his prior convictions, his challenge to the court's ruling on that issue is cognizable on federal habeas review.  *See Luce v. United States*, 469 U.S. 38, 48 (1984) (holding that, in order to present an objection to a trial court's ruling that a prior conviction could be admitted, a defendant must actually testify at trial); *Galindo v. Ylst*, 971 F.2d 1427, 1429 (9th Cir. 1992) (per curium) (applying *Luce* in the context of a habeas petition).

argues that the trial court erred under state law, he cannot prevail on such claim because "[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected." *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987). So, even if the trial court erred in its application of § 352, such error is not a ground for federal habeas relief. *See Estelle*, 502 U.S. at 67-68.

Moreover, the Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Id.* (citing *Williams*, 529 U.S. at 375). Absent such "clearly established Federal law," it cannot be concluded that the appellate court's ruling was an "unreasonable application." *Carey*, 549 U.S. at 77 (noting that, where the Supreme Court has not adequately addressed a claim, a federal court cannot find a state court ruling unreasonable).

Similarly, to the extent Walden argues that the prior convictions inflamed the jury by suggesting Walden's propensity to commit the present crime, the United States Supreme Court has never held clearly that the introduction of propensity evidence violates due process. *See Estelle*, 502 U.S. at 75 n. 5 ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"); *Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (rejecting habeas petitioner's challenge to propensity evidence, where petitioner could point to no Supreme

Court precedent establishing that admission of otherwise relevant propensity evidence violated the Constitution).

In the absence of clearly established Supreme Court law on this issue, AEDPA relief is foreclosed.  *See Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) ("it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (citations and internal quotations omitted); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law") (citation, internal brackets and quotations omitted).  Because the Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court, Walden's challenge to the admission of his prior convictions also must fail.

C.     *Instructional Errors* (Grounds 4, 9)

Walden next challenges the propriety of two instructions charged to the jury.  Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding."  *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id.* Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting

conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72.  Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519 U.S. 2, 5 (1996).

      1.    *Consideration of prior DUI convictions*

Walden first argues that the trial court erred in instructing the jury that it could consider his prior convictions on the issue of his credibility and for the purposes of impeachment because the crimes of misdemeanor DUI and simple possession of controlled substances are not crimes of moral turpitude that may properly be considered for purposes of assessing his credibility.  The record reflects that Walden did not object[3] when the trial court gave the following modified version of CALCRIM No. 375:

> "If you decide that the defendant committed the prior driving under the influence offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not on July 16, 2012, the defendant acted with malice, as required in Count One; was grossly negligent, as required in Count Two; and was ordinarily negligent, as required in the lesser offense to Count Two.  [¶] . . . [¶]  If you conclude that the defendant committed the prior driving under the influence offenses, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of murder or manslaughter.  The People must still prove each charge beyond a reasonable doubt.  [¶]  Do not consider this evidence for any other purpose *except for the limited purposes of determining the defendant's credibility* and . . . whether the People have proved beyond a reasonable doubt the prior conviction enhancements to Count Five."  (Italics added.)

*Walden*, 2018 WL 4091015, at *30.

---

[3]      Because Walden argued that the instruction was incorrect as a matter of law and the error affected his substantial rights, the Court of Appeal addressed the merits on direct appeal notwithstanding the forfeiture.  *Walden*, 2018 WL 4091015, at *30.  This Court will likewise consider the claim on its merits.

Under California law, a misdemeanor conviction involving moral turpitude is admissible to impeach a witness in a criminal trial. *People v. Wheeler*, 841 P.2d 938, 944 (Cal. 1992). Here, the Court of Appeal concluded that the trial court had not abused its discretion by allowing the requested impeachment. *Walden*, 2018 WL 4091015, at *30.

Walden's claim also must fail under federal habeas review. Although Walden argues that the trial court erred in determining that his prior convictions involved moral turpitude under state law, such error does not warrant federal habeas relief. *See Wilson v. Corcoran*, 562 U.S. 1, 4 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); *Estelle*, 502 U.S. at 67-68. And as discussed thoroughly above with respect to Ground 3, the trial did not err in admitting evidence of Walden's drug-related convictions and conduct. Accordingly, the trial court did not err in instructing the jury as to how to utilize that evidence, and Walden is not entitled to relief on this ground.

2. *Lack of unanimity instruction*

Walden also contends that the trial court erred in failing to *sua sponte* give a unanimity instruction because the prosecution relied on two theories to prove Walden's guilt of implied malice murder: 1) that he was under the influence at the time he struck the victims and their dogs and that he had prior DUI convictions; and 2) that he was talking on his cell phone and speeding at the time. The Court of Appeal disagreed, concluding that no unanimity instruction was required. The appellate court reasoned:

> Here, the evidence demonstrated that [Walden] committed one murder, not two. Although the prosecutor argued two possible theories as to how the murder was committed, there is no evidence which would have allowed the district attorney to charge [Walden] with more than one murder. Whether [Walden] killed H.L.-R. because he had

34

injected heroin and was under the influence at the time of the collision, he was talking on his cell phone and speeding at the time, a combination of these circumstances, or based on some other explanation, these distinctions are theories as to how the murder occurred, not discrete crimes.  As our high court observed nearly two decades ago, discrete crimes require an unanimity instruction, theories of the case do not.  (*Russo*, *supra*, 25 Cal.4th at p. 1132.)  Where the evidence merely presents the possibility that the jury may divide as to the exact way the defendant is guilty of a single discrete crime, the trial court need not give the unanimity instruction.  (*Id.* at p. 1135.)

*Walden*, 2018 WL 4091015, at *34.

Even assuming that Walden had a federal constitutional right to a unanimous verdict,

*Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020) (overruling nearly 50 years of Supreme Court

authority to hold that the Sixth Amendment right to jury trial requires a unanimous verdict to

convict a defendant of a serious offense in state court as well as federal court), Walden has not

proven a reasonable probability that the jury could have disregarded the unanimity requirement

given that there is no dispute that Walden committed one crime of murder and, as the state court

noted, there is no requirement of unanimity as to exactly how the crime was committed.  Walden

therefore fails to show that the lack of a unanimity instruction here violated due process or

resulted in prejudicial error.  Walden is not entitled to relief on this ground.

D.     *Prosecutorial Misconduct* (Ground 5)

Walden next argues that the prosecutor committed misconduct by trivializing the burden

of proof.  The Court of Appeal laid out the following factual background:

> During his closing argument, defense counsel discussed the prosecution's burden of proof as follows: "[CALCRIM No.] 220 is the Court's instruction on the burden of proof.  We know . . . the People must prove . . . beyond a reasonable doubt that the defendant was conscious when he acted.  In this instruction it indicates, it says flatly: The defendant in a criminal case is presumed to be innocent and the prosecution must prove every element of every charge beyond a reasonable doubt.  And proof beyond a reasonable doubt is that which leaves you with an abiding conviction of the truth of the charge.  The evidence need not eliminate all possible doubt because everything in life is open to possible or imaginary doubt.  [¶]  The question to ask yourselves is this.  Do I

have a doubt about an element of one of the charges?  Then your follow-up question is, is my doubt reasonable?  Or is . . . my doubt merely a possible doubt or an imaginary doubt?  If you have a doubt about an element of a crime and your doubt is reasonable, then you must vote not guilty on that crime.  [¶]  The judgment of a reasonable man in the ordinary affairs of life, however important, is influenced and controlled by the preponderance of evidence standard.[FN20]  Jurors are permitted and instructed to apply that rule to the determination of civil actions involving the rights of property only.  But in the decision of a criminal case where life or liberty is at stake, something further is required. There must be in the minds of a jury an abiding conviction of the truth of the charge derived from a comparison and consideration of the evidence.  [¶]  This means in your daily affairs, your ordinary daily affairs, no matter how important you think a decision is, you are making that decision on a preponderance of the evidence standard. No matter how important you can think of a decision you would make, using a preponderance of the evidence standard.  We can go back and change almost any decision we make in life.  [¶]  One of the most important decisions we make in life is whether to get married to a particular person or not.  And you're making that decision using a preponderance of the evidence standard.  Why?  A month, a year, ten years later, you can change your mind. You can get a divorce.  [¶]  The marriage example simply illustrates how high of a standard of proof beyond a reasonable doubt is.  If you felt when you got married to that person that you were marrying the right person and you are only using a preponderance of the evidence standard, just think how positive you would have to be if you were required to use beyond a reasonable doubt standard of proof.  [¶]  Once a jury reaches its verdict and it[']s reported by the Court, no jurors can come back the next day, the next month, ten years from now, and say I w[a]nt to change my verdict. That means that when you're deliberating in the deliberation room to come to a verdict of guilty, you have to have an abiding conviction of the truth of the charge.  And abiding means something is going to last with you forever.  If you have a doubt and your doubt is reasonable, your time to express it is in the deliberations room.  [¶]  For each crime charged, if you have a doubt, and it's reasonable, you're required to vote not guilty."

> FN20.  Defense counsel did not define "preponderance of evidence" during his closing argument.  However, the trial court defined the preponderance of the evidence standard in instructing on the use of [Walden's]  prior driving under the influence convictions, using the modified version of CALCRIM No. 375.

Addressing the reasonable doubt standard in her rebuttal argument, the prosecutor stated: "Folks, there is no doubt about the jury instruction concerning reasonable doubt. You have to have an abiding conviction.  *And one would hope that if making important day-to-day decisions, such as getting married, you're not doing it on a preponderance basis. You're doing it on a reasonable doubt basis.*"  (Italics added.)  Defense counsel objected, asserting that the prosecutor was misstating the law.  The trial court overruled the objection.  The prosecutor continued: "The folks in this courthouse right now -- there are dozens of trials going on, and they're all criminal trials that use this same standard of

beyond a reasonable doubt.  So, yes, no doubt, highest burden in the law, but it is not some [i]nsurmountable burden.  It requires close attention to the facts, close attention to the law and holding tight to your common sense.  [¶]  Juries every day in this courthouse convict on this same standard."

After the jurors retired to deliberate, the court offered defense counsel the opportunity to elaborate on his objection.  Defense counsel relied on *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36 (*Nguyen*), for the proposition that, in the ordinary affairs of life, including marriage, people employ the preponderance of the evidence standard, that criminal cases require a higher standard—proof beyond a reasonable doubt—and that the prosecutor had "water[ed] down the beyond a reasonable doubt standard by implying or by coming out and saying that in the ordinary affairs of life, we use a beyond a reasonable doubt standard of proof when we clearly do not."  The court overruled defense counsel's objection, stating that the relevant language in *Nguyen* was dicta rather than a legal holding.

The following morning, after the court had been advised that the jury had reached a verdict, defense counsel indicated that he had submitted a brief to the court offering more detail concerning *Nguyen* and his objection to the prosecutor's characterization of the burden of proof.  Defense counsel stated that he submitted the brief in time such that a revised jury instruction addressing the burden of proof could have been issued to the jury to correct any misunderstanding jurors may have had about the beyond-a-reasonable- doubt standard of proof.  In opposition, the prosecutor stated: "I have read the *Nguyen* case, and I believe my comments were the exact opposite of what *Nguyen* is talking about.  *Nguyen* cautioned against trivializing the reasonable doubt standard.  And my only comment was one would hope that people made decisions such as who they're going to marry on a higher standard beyond a preponderance of the evidence, merely trivializing that portion rather than trivializing the standard of reasonable doubt.  [¶]  Before that and after that, I went on to say that reasonable doubt is the highest standard in the law -- or the law in the country, and that was the crux of the argument."

The trial court stated that, because the jury was correctly instructed with the appropriate standard, and the challenged remarks were not given by the court, "it was something that was fairly not dwelled on to -- to a great extent . . . ."  Accordingly, the trial court elected not to "single that out and give that to the jury this morning."  Immediately thereafter, the jury entered the courtroom and rendered its verdicts.

*Walden*, 2018 WL 4091015, at *37-38.

Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue

of whether the alleged misconduct violated due process.  *See Darden v. Wainwright*, 477 U.S.

168, 181 (1986).  To prevail on such a claim, a petitioner must show that the prosecutor's

conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due

process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Moreover, "[o]n habeas

review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief

only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'"

*Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637-38 (1993)).

Under clearly established federal law, a prosecutor's incorrect and improper comments

will be held to violate the Constitution only if they "so infected the trial with unfairness as to

make the resulting conviction a denial of due process." *Parker v. Matthews*, 132 S. Ct. 2148,

2153 (2012) (per curiam) (quoting *Darden v. Wainright*, 477 U.S. 168, 181 (1986)); *see*

*Sassounian v. Roe*, 230 F.3d 1097, 1106 (9th Cir. 2000).  In determining whether the

prosecutor's remarks rendered a trial fundamentally unfair, the remarks must be analyzed in the

context of the entire proceeding.  *Boyde*, 494 U.S. at 385; *Darden*, 477 U.S. at 179-182.  Even

when prosecutorial misconduct rises to the level of a due process violation, such misconduct

provides grounds for habeas relief only if that misconduct is prejudicial under the harmless error

test articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993).  *Shaw v. Terhune*, 380

F.3d 473, 478 (9th Cir. 2004).

Upon independent review of the challenged comments in light of these guidelines, the

Court concludes that the Court of Appeal's rejection of Walden's claim was neither contrary to,

or an unreasonable application of, clearly-established federal law.  The Court of Appeal

"disapprov[ed] of the prosecutor's statement that in making 'important day to day decisions' like

marriage, she would hope people make such decisions on a 'reasonable doubt basis.'"  *Walden*,

2018 WL 4091015, at *40.  It nevertheless concluded that any error was harmless:

> After defense counsel's objection, the prosecutor emphasized that "The folks in
> this courthouse right now -- there are dozens of trials going on, and they're all criminal

trials that use this same standard of beyond a reasonable doubt.  So, yes, no doubt, highest burden in the law, but it is not some [i]nsurmountable burden.  It requires close attention to the facts, close attention to the law and holding tight to your common sense. [¶]  Juries every day in this courthouse convict on this same standard."  In this regard, rather than trivializing the burden of proof, the prosecutor impressed upon the jury how exacting a standard it is, while at the same time tempering any impression the jury might have derived from defense counsel's closing argument that proof beyond a reasonable doubt was nearly impossible to achieve.  The trial court instructed the jury with CALCRIM No. 220, which correctly stated the standard, including the language that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."  (*See Nguyen*, *supra*, 40 Cal.App.4th at pp. 36-37.)  "'We presume the jury understood and followed the instruction.'"  (*People v. Capistrano* (2014) 59 Cal.4th 830, 880.)

> Accordingly, we conclude that any misconduct committed by the prosecutor in discussing the reasonable doubt standard was harmless beyond a reasonable doubt.

*Id*.

This determination is both reasonable and fully supported by the record.  The prosecutor's challenged comments were isolated rather than extensive.  *See Trillo v. Biter*, 769 F.3d 995, 1002 (9th Cir. 2014) (prosecutor's misstatement about reasonable doubt did not play a prominent role in the trial when it "was a single statement during a closing argument that took twenty pages of transcript after a long criminal trial").  Moreover, the trial court correctly instructed the jury on the reasonable doubt standard.  The trial court also correctly instructed the jury that if the attorneys' comments on the law conflicted with the trial court's instructions, then the jury must follow the instructions.  *See United States v. Medina Castenada*, 511 F.3d 1246, 1150 (9th Cir. 2008) ("In this case, neither party disputes that the jury instructions properly defined the beyond a reasonable doubt standard.  'The jury is regularly presumed to accept the law as stated by the court, not as stated by counsel.'") (quoting *United States v. Rodrigues*, 159 F.3d 439, 451 (9th Cir. 1998)); *see also Mihajson v. McDowell*, 752 F. App'x 538, 539 (9th Cir. 2019) ("The trial court not only properly instructed the jury on the reasonable doubt standard, it

also instructed the jury to follow the court's instructions if they conflicted with counsel's statements.").  Walden is therefore not entitled to relief on this ground.

E.    _Improper Attachment of Enhancements_ (Grounds 6, 7)

Walden further challenges the great bodily injury enhancements imposed on Counts 1 and 2 as well as the enhancement for fleeing the scene of an accident imposed on Count 1.  But the Court of Appeal agreed with Walden's direct appeal challenge to those enhancements and struck them from Walden's judgment.  _Walden_, 2018 WL 4091015, at *44-46.  Because Walden already has obtained the relief he now seeks, his resentencing claims are moot.  _See Burnett v. Lampert_, 432 F.3d 996, 1000-1001 (9th Cir. 2005) (petition is moot when a favorable decision of the court would not offer petitioner any relief).

F.    _Cumulative Error_ (Ground 8)

Finally, Walden argues, as he did on direct appeal, that the cumulative effect of the trial court's errors warrants reversal of his conviction.  The Ninth Circuit has stated "[t]he Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair."  _Parle v. Runnels_, 505 F.3d 922, 927 (9th Cir. 2007) (citing _Chambers v. Mississippi_, 410 U.S. 284, 298 (1973)); _see also Whelchel v. Washington_, 232 F.3d 1197, 1212 (9th Cir. 2000).  "Cumulative error applies where, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors has still prejudiced a defendant."  _Jackson v. Brown_, 513 F.3d 1057, 1085 (9th Cir. 2008) (quoting _Whelchel v. Washington_, 232 F.3d 1197, 1212 (9th Cir. 2000)).  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the

40

evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness." *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers*, 401 U.S. at 298, 302-03). Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (citation omitted). In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process. *See Chambers*, 401 U.S. at 294.

Here, the Court of Appeal rejected Walden's cumulative error claim because it did not find any prejudicial error. Walden fares no better on federal habeas review. Because, as discussed throughout this opinion, Walden does not demonstrate any prejudicial federal constitutional error, he fails to establish prejudice in the aggregate. *See, e.g.*, *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible."). The Court of Appeal did not unreasonably apply *Chambers v. Mississippi*, 410 U.S. 284 (1973), by rejecting Petitioner's claim of cumulative error. Because Walden failed to show any individual prejudicial constitutional errors, fairminded jurists could reasonably agree with the Court of Appeal that any alleged individual errors did not cumulatively render Walden's trial "fundamentally unfair." *Parle*, 505 F.3d at 928-930. Walden's cumulative error claim therefore must fail.

V. CONCLUSION AND ORDER

Walden is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: September 14, 2021.

   /s/James K. Singleton, Jr.   
JAMES K. SINGLETON, JR.
Senior United States District Judge
